**Kramer Trust**

*John J. Petrush,* for accountant.

*J. Jerome Mansmann,* for settlor.

McKENNA, *P. J.,* August 5, 1975—This case is before us on objections made by Olive S. Kramer to the first and final account of Union National Bank of Pittsburgh, filed by it as trustee under a trust agreement made by and between Olive S. Kramer and the bank.

The said agreement was made on February 27, 1970. It was revoked in October of 1974. The account was filed on April 25, 1975; this came before the court for audit on June 11, 1975. The court was then apprised of the objections and a hearing was set for July 8, 1975. The case was tried on that date. Mrs. Kramer testified, as did two officers of the bank.

At the time of the execution of the trust agreement on February 27, 1970, Mrs. Kramer was a recent widow. Her husband had bequeathed to her his entire estate, which amounted to $42,000. She and her attorney consulted a trust officer at Union National Bank for ad-

vice in the management of her affairs. She was then receiving $125 per month from Social Security and hoped to receive a like sum as a return on investments. After some discussions, she deposited $12,000 in an account which she intended to use to augment her income and delivered $30,000 to the bank to be held by it and administered according to the terms of the trust instrument. This provides that the trustee shall pay the net income to Mrs. Kramer and, in addition, so much of the principal as she may request. On her death, the estate passes to her daughter. The trustee has the sole power to make or change investments.

At the inception of the trust, the trustee invested $15,000 in treasury notes and $15,000 in common stock, including 50 shares of General Motors. This was bought at 72.5, or a gross purchase price, including costs, of $3,660.13. Mrs. Kramer did not object to the investments then made.

In the summer of 1973, the grantor-beneficiary called a trust officer at the bank and advised him that as of the first of 1974, she would need additional cash to supplement her income. She asked for $2,000. She suggested that the treasury notes be converted into cash to the extent necessary to raise the required sum. However, the trust officer consulted an investment advisor in the bank, and as a result of this conference the trustee sold the 50 shares of General Motors at 48.25, which produced a net sum of $2,366.95. Mrs. Kramer asks us to surcharge the trustee with the sum of $1,293.18, the loss on the sale, less $20, which would have been the loss on the conversion of treasury notes, or the sum of $1,273.18.

The second claim by Mrs. Kramer is for fees charged by the trustee. It is her position that sound counseling by the bank officer when she first consulted him in early 1970 would have dictated that she manage her

own investments without a trustee. She claims the estate was too small to be burdened with administrative expenses, and that the bank should now refund to her the fees it charged. It is agreed that these are as follows: $300 on principal and $6.16 on income as shown in the account, plus $456.49 in fees charged during administration.

Mrs. Kramer's final objection is to a $27 credit shown in the account for the cost of filing with the clerk of the Orphans' Court a certified copy of the original trust agreement. The bank lost or misplaced the original, and it was necessary to substitute a copy. She asks that the bank be surcharged for the $27.

We will discuss the objections in order.

### The Loss on the Sale of General Motors Stock

In considering this question, we are guided by the rule that a fiduciary who has or procured his appointment by representing that he has greater knowledge and skill in the handling of estate and trust accounts than a man of ordinary prudence is obligated to exercise such special skills. See Killey Trust, 457 Pa. 474, 326 A.2d 372 (1974). It is agreed, and we find in this case, that the bank did hold itself out to the general public, including Mrs. Kramer, as an expert in managing trust funds.

We will not surcharge the trustee for the loss in the sum of $1,273.18 on the sale of General Motors stock. The investment, when made, was sound and was approved by Mrs. Kramer. The decision to sell made in January of 1974 was not approved by the grantor. However, we cannot say that this decision constituted such negligence as should result in a surcharge. The trust officer, Mr. H. Donald Kennedy, conferred with an investment counselor, and after consideration of all as-

pects of the situation, including Mrs. Kramer's need for income, the sale was made. It is true that shortly after the transaction the stock reached a high of 53.25. However, it could not be contended that a trustee may be surcharged for failing to sell securities at the high point during the period in which a sale is under consideration.

The record shows that on the day of the hearing General Motors sold at 48.5. Mrs. Kramer could have converted some treasury notes and with the proceeds purchased 50 shares of General Motors. She would then be in approximately the same position she was in prior to the sale made by the trustee in January of 1974. Under these circumstances, no surcharge is in order.

## The Trustee's Compensation

The objection to this item must be dismissed. Mrs. Kramer had her own counsel when she entered into the trust agreement. It was she who was most desirous that it be made. Mr. Robert Montgomery, an investment counselor with the bank, testified that a trust of the size of that here under consideration is not profitable for a bank, but that such accounts are frequently accepted as accommodations for commercial customers. This trust decreased in value, as did others in the period between January of 1970 and February of 1974. However, the trustee's management of Mrs. Kramer's securities was not such as to cause it to forfeit its compensation. This objection will be dismissed.

## The Cost of Filing a Certified Copy of the Trust Instrument

We find that this objection must be sustained. The

expense of filing a certified copy of the trust instrument should be borne by the bank, since the loss of the original was occasioned by its negligence. It cannot ask her to pay for this. 2 Hunter O. C. 13. (Negligent Fiduciary §4)

The matter is almost "de minimis." However, since the issue has been raised, we believe it must be determined in the manner indicated.

A decree will be entered in accordance with this opinion.